Cordy, J.
(concurring, with whom Botsford and Duffiy, JJ., join). I concur in the court’s conclusion that the Department of Children and Families (department) has a compelling interest in protecting the physical and emotional well-being of foster children, and that it could reasonably interpret its enabling legislation to deny an application to become foster and preadoptive parents because of the applicants’ use of physical discipline as a form of disciplining their own children. I write separately to question the uniformity of the department’s application of its standards for assessing the suitability of foster parents and their licensing across the department’s western region, and the consistency of the rigor it applied to the plaintiffs’ application compared to the applications of others who posed significant risks to the compelling interests the department is charged with protecting.[1]
I begin with several propositions that I expect would be beyond dispute. First, the department’s filings for custody have been significantly increasing, some would say “soaring,” over the last several years.[2] Second, the department is in dire need of qualified foster parents and homes to care for this burgeoning population of children who have been removed from the custody of their par *447 ents because of severe abuse and neglect. Third, the challenges facing foster parents can be as daunting as their role is important, and the department must provide them both an appropriate level of oversight and support to ensure the successful transition of the children in their care.
Turning to the plaintiffs and their interest in providing a safe, caring, and nurturing environment to this particularly vulnerable population, it is apparent from the record that in every respect (but for one) they were ideal foster and preadoptive candidates. They had a very stable home environment, a nurturing supportive relationship with their own two children, and an excellent record of employment and community involvement. The department’s file reveals that it conducted an in-depth and thorough inquiry into and review of the plaintiffs’ personal and family experiences and upbringing, as well as their home life. The plaintiffs cooperated fully and candidly in detailing their experiences, their reasons for wanting to serve as foster parents, and the relationship with their two children.
In the end, the only flaw latched onto by the department was the plaintiffs’ explanation that their deeply held Christian religious beliefs included the use of physical discipline (albeit sparingly applied) in the upbringing of their children. This honest revelation led to further intense inquiry whether such punishment would be used on children placed into their care by the department, which would be contrary to its explicit regulation against the use of such discipline on foster children. The plaintiffs advised the department that they fully understood this limitation and would comply with the regulation and the required written contract provisions that would govern their relationship.
The department conceded that there was no reason for the department to doubt the sincerity of the plaintiffs, but wanted additional assurances (beyond what was required in its regulations and its contract) that the plaintiffs would not physically discipline their own children during periods when they had foster children in their care. The plaintiffs could not agree to this condition because of their religious views, but advised that they did not physically discipline either of their children in the presence of the other and would not do so in the presence of the foster children in their care. This apparently was not good enough, and the department found that the plaintiffs did not meet the department’s licensing standards because they physically disciplined their own children.
*448 While the department’s position might, when balanced against all of the positives the plaintiffs possessed, seem overly rigid and cautious in the extreme, the department’s responsibility to children already exposed to abuse or neglect is very substantial. That heightened responsibility could justify the department’s declining a family setting in which such a child might feel insecure or unsafe or traumatized if he or she becomes aware that physical discipline was being meted out to other children.
One is left to wonder, however, whether the real problem in this case was not so much the department’s concern for child safety, but rather a disagreement with the plaintiff’s beliefs regarding the upbringing of their children. While we have no other licensing investigation files in the record before us, it is hard to ignore the highly public tragedies of the last two years regarding children under the supervision of the department in foster homes, and not to question whether the high standards and intensive assessment and scrutiny applied to the plaintiffs is the exception rather than the norm, particularly in the western region.
Fuel for this concern comes most recently in an official investigative report of the death and near death of two foster children placed in the foster home of a woman, also located in the western region.[3] The death and injury were due to severe neglect. The investigative report of the case is revealing in many respects, but most particularly in its description of the licensing investigation, and its inadequacies, that led to the licensure of the woman as a foster parent shortly after the plaintiffs’ application was denied. According to the report, the applicant was an unmarried woman with medical issues, who was supported by Supplemental Security Income disability payments, and who had two children who no longer had contact with their father, as well as an adopted third child. At least one of these children also had serious medical issues, and during the licensing investigation the doctor for the woman’s children advised that she was already overwhelmed by managing her own children’s medical needs. In addition, G. L. c. 119, § 51 A, reports of abuse and neglect had been filed against her;[4] the school attended by one of her children reported that the child was chronically absent, and was out of control; and it was *449 known that there was a family history of neglect. Further, the licensing investigation did not include a routine check with the local police, which would have revealed that the police had been called at least twenty-five times in response to problems at her home. Regardless, the woman was licensed by the department, and at the time of the tragedy, she had three children assigned to her care by the department (in addition to her other three children).[5]
Whether the department’s process and standards resulting in the licensing of this foster mother is the norm or the exception, we do not know. Hopefully, it is the exception, and whatever the licensing standard actually is, it will be uniformly applied.

In its 2015 annual report, the Office of the Child Advocate reported that on the basis of its reviews of G. L. c. 119, § 51 A, neglect and abuse reports filed with, investigated, and supported by the Department of Children and Families (department) in the prior year, its staff had found “concerning trends” within foster homes and regarding the selection of certain foster homes. Of the § 51A reports it reviewed, more than sixty per cent involved children in foster homes. See Office of the Child Advocate, Annual Report: Fiscal Year 2015, at 9-10.

In June, 2014, the Boston Globe reported that from December 2013, through May, 2014, the department had filed 2,000 court petitions to gain custody of children it determined to be at risk of abuse or neglect, a fifty-two per cent increase from the previous year. It further reported that in May, 2014, the department filed 265 petitions, a seventy per cent jump from May, 2013. See R Schworm, State Filings for Custody of Children Soaring, Boston Globe, June 20, 2014, at A.l.

See generally “Case Review: The Foster Home of Kimberly Malpass, September 30, 2015,” prepared by the Executive Office of Health and Human Services, Department of Children and Families.

One of these reports, filed in June of 2012 (before she was licensed), alleged neglect of her three children and that one or more of her children had been beaten with a belt by her boy friend. After the woman was licensed, and six *449 months prior to the death of one of the foster children placed in her care, the department received another report that the woman’s boy friend had been living in the home (unreported), was a drug user, was a “disciplinarian in the home and [had] hit [one of the foster children] in the head .. . when [the foster child] was not listening.” Although it was apparent that she likely was not truthful in the subsequent “investigation,” at least with respect to her relationship with her boy friend and their living arrangements, no action was taken except that it was “emphasized” to her that “all frequent visitors needed to be approved by [the department].”

Foster parents receive a daily financial stipend from the department for each child in their care, plus allowances for clothing, birthdays, and holidays.